# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | CRIM. ACT. NO. 1:24-cr-112-TFM |
| | ) | CRIM. ACT. NO. 1:24-cr-113-TFM |
| GLENNIE ANTONIO MCGEE | ) | |

## MEMORANDUM OPINION AND ORDER ON SANCTIONS

For ease of the reader, the Court first provides this short summary of the sanctions ruling followed by the detailed opinion. It is determined that Attorney James A. Johnson utilized an artificial intelligence ("AI") program in the drafting of a motion which as a result contained fabricated citations that he failed to check prior to submitting the motion to the Court. The issue was discovered by opposing counsel, confirmed by the Court, and acknowledged by Mr. Johnson. After a careful review of the matter, the Court determines that Mr. Johnson's conduct was tantamount to bad faith. Therefore, the Court **SANCTIONS** him under its inherent authority and **ORDERS** as follows:

1. Attorney James A. Johnson is hereby **REPRIMANDED** and this reprimand shall be published as follows:

    a. Attorney James A. Johnson shall file, not under seal, a copy of this Memorandum Opinion and Order in any case in any court wherein he has appeared as counsel and final judgment has not been entered;

    b. Attorney James A. Johnson shall file, not under seal, a copy of this Memorandum Opinion and Order in any case in any court wherein he appears as counsel for twelve (12) months after the date of this order;

    c. Attorney James A. Johnson shall provide a copy of this Memorandum Opinion and

       Order to any jurisdiction under which he is licensed to practice law within two (2) business days of the issuance of this order. He shall further file a notice of compliance with the Court no later than the third business day.

    d. The Clerk of Court shall send a copy of this Memorandum Opinion and Order to the General Counsel of the Alabama State Bar for review. Though referred to the Alabama State Bar for any disposition it deems appropriate, the undersigned recommends that the public reprimand and sanctions contained within this order be the final action with regard to these particular allegations and facts.

    e. The Clerk of Court shall send a copy of this Memorandum Opinion and Order to the Chief Judges for the Northern District of Alabama and the Middle District of Alabama.

    f. To further effectuate the reprimands and deter similar misconduct by others, the Clerk of Court is **DIRECTED** to submit this order for publication in the Federal Supplement.

2. Attorney James A. Johnson is **REFERRED** to the Southern District of Alabama's advisory panel to consider whether he should be removed from the CJA panel.

3. The Court **IMPOSES** a fine in the amount of $5,000.00 payable to the CJA fund to offset some of the losses because of this matter.

The Court now turns to the full Memorandum Opinion and Order.

## I.  BACKGROUND

On July 3, 2025, James Johnson (counsel for Defendant Glennie McGee) filed a motion to continue the trial in both cases: Doc. 509, Crim. Act. No. 1:24-cr-112 ("drug conspiracy case"); Doc. 251, Crim. Act. No. 1:24-cr-113 ("financial fraud case").[1] In its response in opposition (Doc. 532, filed 7/10/25), the United States indicates that counsel for Defendant McGee appears to have fabricated citations in that he cites "several nonexistent cases, attributing false quotations to others, and directing this Court to precedent that the Supreme Court reversed more than 40 years ago. McGee's incorrect and outright fake citations—many of which the United States has been unable to locate despite diligent searches—bear the hallmarks of legal authorities 'hallucinated' by artificial intelligence." Doc. 532 at 1. In its opposition, the United States describes at length the basis for his belief that counsel for Defendant McGee fabricated citations. *Id*. at 5-8.

In the light of the seriousness of the accusation, the Court conducted independent searches related to the citations at issue. Regarding the cases that allegedly do not exist, the Court's search revealed the same problems and the allegations made by the United States were correct: the cases do not exist, citations did not go to the referenced names, and/or the cases did not relate to the issues at hand. For the cases that relate to misrepresentations or false quotations, the search did not fare any better for defending the use of those citations in the manner and context given. Finally, the Court also agrees that certain caselaw cited was long ago overruled by the Supreme Court.

Therefore, the Court issued a show cause order making these points and instructing Mr.

---

[1] The motion is filed in both cases. *See* Doc. 509, Crim. Act. No. 1:24-cr-112 ("drug conspiracy case"); Doc. 251, Crim. Act. No. 1:24-cr-113 ("financial fraud case"). However, the Court failed to issue an order in the 113 financial fraud case for the United States to respond, and the United States' response is only docketed in the drug conspiracy case and is tailored toward that case. As such, any docket citations in this order reference the drug conspiracy case. However, this Memorandum Opinion and Order is being docketed in both cases as the allegations referenced below and the show cause order are applicable in both cases.

Johnson to show cause why he should not be sanctioned under the Court's inherent authority, S.D. Ala. GenLR 83.3(i), and/or Alabama Rule of Professional Conduct 3.3 for making false statements of fact or law to the Court. *See* Doc. 537. As part of the response, Mr. Johnson was ordered to append to his filing copies of each allegedly fabricated legal authority or if he could not provide such copies, to submit a sworn declaration that provides a thorough explanation for how the motion and allegedly fabricated cases were generated. *Id*.

On July 14, 2025, counsel appeared on behalf of Mr. Johnson to represent him at the show cause response and hearing. *See* Doc. 544. Counsel for Mr. Johnson filed a response along with an affidavit from Mr. Johnson. *See* Doc. 545. The response asserts the use of fictitious authorities was an embarrassing mistake, but that Mr. Johnson did not knowingly or intentionally use a resource that he thought would or could make up the citations. The response further argues that Mr. Johnson's conduct while negligent and/or ignorant did not rise to the level of reckless or bad faith. *Id*. As Exhibit 1, there is a Declaration from Mr. Johnson. *See* Doc. 545-1. In the declaration, Mr. Johnson apologizes to the Court, opposing counsel, and his client for the inadvertent mistake which he "made under time pressure and difficult personal circumstance." *Id*. at 1. He indicates that on July 3, 2025, while at an out-of-state hospital attending to the care of a family member recovering from surgery, he received the notice that the pretrial conference in the financial fraud case had been moved up on the Court's schedule. Therefore, he needed to file his motion to continue before the holiday weekend. While Mr. Johnson indicated he typically used Fastcase (a research tool provided by the Alabama State Bar), in this instance he used a Microsoft Word plug-in called Ghostwriter Legal to find additional cases to support the motion. Though Mr. Johnson could not remember the exact search terms used, he indicates it returned a list of cases which seemed relevant and legitimate which he inserted into the motion to continue. He further

indicated that he used Ghostwriter because it appeared automatically in the sidebar of Word while Fastcase required opening a separate browser to access through the Alabama State Bar website. Since he was only on his laptop, he found it "tedious to toggle back and forth between programs on [his] laptop with the touchpad" and "unfortunately fell victim to the allure of a new program that was open and available." *Id*. at 5. Mr. Johnson indicated that he was aware of news accounts about ChatGPT and fake case citations, but he thought that Ghostwriter Legal was a reliable research program. He further includes excerpts from promotional materials and reviews as it relates to Ghostwriter Legal. *Id*. at 5-6. He further asserts that after additional research he now understands that many paid and free AI programs can create citations that do not exist and are unreliable. He states "[w]hen I used Ghostwriter the idea that the search results, which looked authentic, could be completely made up never even entered my mind. Whether that was due to my naivete related to AI or overblown puffery by the company, I will never make that mistake again." *Id*. at 7. Mr. Johnson says it was an honest mistake and that he never intended to mislead the Court or opposing counsel or to cast an unfavorable light on his client. *Id*.

The Court held the show cause hearing on July 16, 2025. At the hearing, Mr. Johnson and his counsel acknowledged the error and Mr. Johnson accepted responsibility for using a program without checking the citations. The United States also asked to be heard on the matter and provided its own exhibits about Ghostwriter Legal. *See* Doc. 565, Government Exhibits 1—3. Counsel for the United States noted that it seemed confusing that Mr. Johnson disclaimed use of ChatGPT when the very information from Ghostwriter Legal made it clear that it used ChatGPT as its default AI program.

At the conclusion of the sanctions hearing, the Court inquired of Defendant McGee whether he was comfortable proceeding with Mr. Johnson as counsel and he responded "No, sir,

I'm not." After a short recess during which Mr. Johnson and Defendant McGee conferred with each other, the Court held an *ex parte* hearing to address the release of Mr. Johnson and appointment of new counsel. Ultimately, Mr. McGee stated he wanted a new counsel and understood that it would result in a significant delay of trial to give new counsel time to prepare.[2]

## II. DISCUSSION AND ANALYSIS

"Many harms flow from the submission of fake opinions." *Mata v. Avianca, Inc.*, 678 F. Supp.3d 443, 448 (S.D.N.Y. 2023). This concept is well known and is a longstanding principle in the practice of law. Yet, the improper use of generative AI is a problem that sadly is not going away despite the general knowledge in the legal community that AI can hallucinate and make up cases. AI hallucination has been reported on extensively in media (not just in the legal context, but at large) and the subject of many seminars and continuing legal education trainings offered by bar associations, articles written in legal journals, and numerous well reported instances of courts sanctioning attorneys. Somehow the message still has not been hammered home as the epidemic of citing fake cases continues unabated. *See, e.g. Park v. Kim*, 91 F.4th 610, 615 (2d Cir. 2024); *Benjamin v. Costco Wholesale Corp.*, 779 F. Supp. 3d 341 (E.D.N.Y. 2025); *United States v. Hayes*, 763 F. Supp. 3d 1054 (E.D. Cal. 2025), *reconsideration denied*, Civ. Act. No. 2:24-cr-0280-DJC, 2025 U.S. Dist. LEXIS 68016, 2025 WL 1067323 (E.D. Cal. Apr. 9, 2025); *Ferris v. Amazon.com Servs., LLC*, 778 F. Supp. 3d 879 (N.D. Miss. 2025); *Sanders v. United States*, 176 Fed. Cl. 163 (Fed. Cl. 2025); *Wadsworth v. Walmart Inc.*, 348 F.R.D. 489 (D. Wyo. 2025); *Johnson*

---

[2] On July 18, 2025, the Court appointed Jason Darley from the CJA panel to represent Defendant McGee. Subsequently, on July 24, 2025, McGee requested to proceed *pro se*. The Court conducted a hearing pursuant to *Faretta v. California*, 422 U.S. 806 (1975) on August 4, 2025 and determined that McGee made a knowing and voluntary decision to proceed with self-representation and appointed Mr. Darley as standby counsel to assist. The Court further held a scheduling conference for the drug conspiracy and financial fraud cases which were set for January 5, 2026 and February 23, 2026 respectively – a delay of roughly five and six months on the cases.

*v. Dunn*, --- F. Supp.3d ---, Civ. Act. No. 2:21-cv-1701-AMM, 2025 U.S. Dist. LEXIS 141805, 2025 WL 2086116 (N.D. Ala. July 23, 2025); *Elizondo v. City of Laredo*, Civ. Act. No. 5:25-cv-50, 2025 U.S. Dist. LEXIS 140572, 2025 WL 2071072 (S.D. Tex. July 23, 2025); *Willis v. U.S. Bank Nat'l Ass'n as Tr., Igloo Series Tr.,* Civ. Act. No. 3:25-CV-516-BN, 2025 U.S. Dist. LEXIS 79916, 2025 WL 1224273 (N.D. Tex. Apr. 28, 2025); *Bevins v. Colgate-Palmolive Co.*, Civ. Act. No. 25-CV-576, 2025 U.S. Dist. LEXIS 68399, 2025 WL 1085695, at *7 (E.D. Pa. Apr. 10, 2025); *Gordon v. Wells Fargo Bank N.A. Inc.*, Civ. Act. No. 24-CV-388, 2025 U.S. Dist. LEXIS 66601, 2025 WL 1057211 (M.D. Ga. Apr. 8, 2025); *Dehghani v. Castro*, Civ. Act. No. 25-CV-0052, 2025 U.S. Dist. LEXIS 63641, 2025 WL 988009 (D.N.M. Apr. 2, 2025), *aff'd by Dehghani v. Castro*, 782 F. Supp. 3d 1051 (D.N.M. May 9, 2025); *Gauthier v. Goodyear Tire & Rubber Co.*, Civ. Act. No. 1:23-cv-281, 2024 U.S. Dist. LEXIS 214029, 2024 WL 4882651 (E.D. Tex. Nov. 25, 2024).

The Court notes this enormous string citation is only a small segment of what the undersigned found. Simply put, the legal community is well aware of the dangers and pitfalls of using AI shortcuts without further review or supervision. To be clear, the Court is not saying that AI has no place in the practice of law. AI can absolutely be a useful tool. But in the same realm as supervising subordinate's work or checking citations found indirectly, a lawyer is absolutely responsible for the citations and submissions to courts.

**A.    Sanctions Authorities**[3]

---

[3] While not applicable in *this* case because it is a criminal case as opposed to a civil case, the Court notes that Mr. Johnson noted on several occasions that his background consisted primarily of civil litigation so he should be well familiar with Fed. R. Civ. P. 11 which states "[b]y presenting to the court a pleading, written motion, or other paper[,] . . . an attorney . . . certifies that . . . after an inquiry reasonable under the circumstances . . . the claims, defenses, and other legal contentions are warranted by existing law." FED. R. CIV. P. 11(b)(2). The federal rules of criminal procedure do not have a specific provision for the same which is why it is not listed among the authorities utilized for this case.

Alabama Rule of Professional Conduct 3.3 provides that "[a] lawyer shall not knowingly . . . [m]ake a false statement of material fact or law to a tribunal". Ala. Rules of Prof'l Conduct 3.3(a)(1). The comments to the Rule further state "[a]n advocate is responsible for pleadings and other documents prepared for litigation…" Ala. Rules of Prof'l Conduct 3.3, cmt. Further, "an assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry." *Id*. The comment further provides that "[l]egal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal. A lawyer is not required to make a disinterested exposition of the law, but must recognize the existence of pertinent legal authorities." *Id*.

Next, the Southern District of Alabama also has encompassed in its local rules the following:

> Standards for Professional Conduct; Obligations. Attorneys appearing before this Court shall adhere to this Court's Local Rules, the Alabama Rules of Professional Conduct, and the Alabama Standards for Imposing Lawyer Discipline. Attorney misconduct, whether or not occurring in the course of an attorney/client relationship, may be disciplined by disbarment, suspension, reprimand, monetary sanctions, removal from this Court's roster of attorneys eligible for practice before it, or such other sanction as the Court may deem appropriate.

S.D. Ala. GenLR 83.3(i). Next, the local rules also provide a section on attorney discipline which states:

> When alleged attorney misconduct is brought to the attention of the Court, whether by a Judge, any lawyer admitted to practice before the Court, any officer or employee of the Court, or otherwise, the Court may, in its discretion, dispose of the matter through the use of its inherent, statutory, or other powers; refer the matter to an appropriate State Bar agency for investigation and disposition; refer the matter to the Local Grievance Committee as hereinafter defined; or take any other action the Court deems appropriate. These procedures are not mutually exclusive.

S.D. Ala. GenLR 83.4(a). The Court also must look to its Criminal Justice Act ("CJA") Plan as

Mr. Johnson was appointed under the auspices of the CJA. *See* Criminal Justice Act Plan, Amended July 2020, available at https://www.alsd.uscourts.gov/sites/alsd/files/CJAPLAN.pdf. It states that "[a]ttorneys appointed pursuant to CJA shall conform to the highest standards of professional conduct, including but not limited to the provisions of the American Bar Association's Model Rules of Professional Conduct."[4] *Id*. at 8, Section VII(B). The American Bar Association has its own equivalent to Rule 3.3 which states "[a] lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer [or] (2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel". MODEL RULES OF PRO. CONDUCT R. 3.3. Moreover, the comments state

> An advocate is responsible for pleadings and other documents prepared for litigation…
>
> . . .
>
> Legal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal. A lawyer is not required to make a disinterested exposition of the law, but must recognize the existence of pertinent legal authorities. Furthermore, as stated in paragraph (a)(2), an advocate has a duty to disclose directly adverse authority in the controlling jurisdiction that has not been disclosed by the opposing party. The underlying concept is that legal argument is a discussion seeking to determine the legal premises properly applicable to the case.

MODEL RULES OF PRO. CONDUCT R. 3.3 cmt.

---

[4] The CJA Plan also references the American Bar Association's Model Code of Professional Conduct. According to the ABA, "The ABA Model Rules of Professional Conduct were adopted by the ABA House of Delegates in 1983. They serve as models for the ethics rules of most jurisdictions. Before the adoption of the Model Rules, the ABA model was the 1969 Model Code of Professional Responsibility. Preceding the Model Code were the 1908 Canons of Professional Ethics (last amended in 1963)." Therefore, the only applicable provision is the ABA Model Rules of Professional Conduct.

Finally, the Court turns to its inherent authority to sanction.[5] "It has long been understood that '[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *United States v. Hudson*, 11 U.S. 32, 34 (1812)). "An attorney who violates his or her ethical obligations is subject to professional discipline, including sanctions, suspension, and disbarment." *Connick v. Thompson*, 563 U.S. 51, 66 (2011). Additionally, "[c]ourts have long recognized an inherent authority to suspend or disbar lawyers . . . derive[d] from the lawyer's role as an officer of the court which granted admission. *In re Snyder*, 472 U.S. 634, 643 (1985) (citations omitted); *see also Chambers*, 501 U.S. at 43 (citing *Ex parte Burr*, 22 U.S. 529, 530 (1824)) ("a federal court has the power to control admission to its bar and to discipline attorneys who appear before it."). These inherent powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630-631 (1962).

Yet, "[a] court must, of course, exercise caution in invoking its inherent power," and "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power." *Chambers*, 501 U.S. at 50 (internal citation omitted). "[I]f in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Id*.

**B.     Findings of Fact and Conclusions of Law**

Turning now to this particular case. The harms that flow from the submission of

---

[5] Although Fed. R. Civ. P 11(b) "reaches only certain individuals or conduct, the inherent power extends to a full range of litigation abuses." *Chambers*, 501 U.S. at 46

"hallucinated" or "false" cases are not minimal. Recently a sister court articulated them at length.

> "The opposing party wastes time and money in exposing the deception," and "[t]he client may be deprived of arguments based on authentic judicial precedents." *Mata*, 678 F. Supp. 3d at 448. While the court takes time to investigate, other cases may be disrupted or deprived of judicial attention. Other harms affect the judicial system:
>
> There is potential harm to the reputation of judges and courts whose names are falsely invoked as authors of the bogus opinions and to the reputation of a party attributed with fictional conduct. It promotes cynicism about the legal profession and the American judicial system. And a future litigant may be tempted to defy a judicial ruling by disingenuously claiming doubt about its authenticity. *Id*. at 448-49. And the public (whose taxpayer dollars pay the lawyers at issue here) is justifiably horrified and outraged when filings in a court of law substitute lazy, convenient fictions for the truth.
>
> Even in cases like this one, where lawyers who cite AI hallucinations accept responsibility and apologize profusely, much damage is done. The opposing party expends resources identifying and exposing the fabrication; the court spends time reviewing materials, holding hearings, deliberating about sanctions, and explaining its ruling; the substance of the case is delayed; and public confidence about the trustworthiness of legal proceedings may be diminished.

*Johnson*, 2025 U.S. Dist. LEXIS 141805, at *32-33, 2025 WL 2086116, at *11.

The Court further finds in reviewing the sanction authorities that it is not completely clear whether this conduct fits squarely within the Rule 3.3 of the Alabama Rules of Professional Conduct and the ABA Model Rules of Professional Conduct. As pointedly noted in the *Johnson* case:

> Further, it is unclear to the court that Alabama Rule of Professional Conduct 3.3 applies to the misconduct at issue here. On the one hand, inserting into court filings unverified legal citations generated by AI is wholly inconsistent with the duty of candor that Rule 3.3 enumerates. On the other hand, by its terms Rule 3.3 forbids only knowing misstatements of law, and these false statements occurred because none of the three attorneys at issue bothered to verify the hallucinated citations … As far as the court can discern, the Alabama Supreme Court has not yet had the opportunity to consider whether Rule 3.3 applies to this specific kind of misconduct. Absent such guidance, the court will not extend that rule beyond its plain terms.

*Johnson*, 2025 U.S. Dist. LEXIS 141805 at *39-40, 2025 WL 2086116 at *14. This Court agrees

with the sentiment and analysis. Therefore, the Court will not look to Rule 3.3 for its authority.

Likewise, Local Rule 83.3(i) does not *clearly* forbid this misconduct. Rule 83.3(i) forbids violations of the Alabama Rules of Professional Conduct but does not set out a separate and independent universe of forbidden conduct relevant here.

But, the Court is not powerless. Despite the gaps in the rules above, the Court is left with it inherent authority which is designed precisely for this type of misconduct – something that does not expressly fit into a specific rule but is clearly IS misconduct because what is clear to every lawyer and judge is that providing false statements and citations generated by AI and provided without any independent verification wholly violates the spirit and intention of candor and causes great harm to the Court, parties, and indeed the legal community at large. Put bluntly in a law review article released two years ago: "Citing nonexistent case law or misrepresenting the holdings of a case is making a false statement to a court. It does not matter if [generative AI] told you so." Maura R. Grossman, Paul W. Grimm, & Daniel G. Brown, Is Disclosure and Certification of the Use of Generative AI Really Necessary?, 107 Judicature 68, 75 (2023).

Turning now to the analysis of the case at hand involving Mr. Johnson, the Court notes that the written response and the oral arguments presented at the show cause hearing took slightly different approaches. The written response seems to indicate "that the applicable standards do not allow (or require) sanctions" though it does acknowledge that it "does not mean the underlying mistake is excusable." Doc. 545 at 3. The Court can appreciate the technical arguments that counsel for Mr. Johnson attempts to make even as he softens it with "in candor, that may sound like an effort to hide behind technicalities" which "is not Mr. Johnson's intent." *Id*. During the hearing, Mr. Johnson essentially acknowledges his error and throws himself upon the mercy of the Court – though as discussed later, it was clear he did not fully appreciate the gravity of the

consequences as they may relate to his client.

Mr. Johnson admits that he used Ghostwriter Legal to aid in the drafting of his motion to continue without verifying the citations and statements it provided. He does not contest that it was his responsibility to review and confirm authorities prior to submission.

The Court notes from the outset that it does not matter that there may be actual authorities that stand for the proposition that the bogus authorities were offered to support. Ultimately, the Court finds that to be irrelevant and does not remediate the wasted time, additional work, and harm caused by the misconduct. "[A]ny sanctions discount on this basis would amplify the siren call of unverified AI for lawyers who are already confident in their legal conclusion." *Johnson*, 2025 U.S. Dist. LEXIS 141805 at *46, 2025 WL 2086116 at *16. This Court agrees and rejects any such notion that because some authority exists to support a legal proposition it should negate the harm caused by false and hallucinated cases. Put bluntly – absolutely not; period; end of story; all stop.

The Court notes that the majority of cases found involving AI hallucinated cases relate to civil litigation and the harm there is certainly great. But, this is a criminal case in which the defendant had an appointed counsel which is paid for pursuant to the CJA which are public funds. It is clear from the show cause hearing that one particular point Mr. Johnson did not anticipate is that his client would lose confidence in him and request a new lawyer. This was evidenced by his look of shock, dismay, and display of emotion when Defendant McGee indicated he no longer had confidence in his counsel and wanted a new counsel even though it would result in a significant delay in the trials for these two complex criminal cases. This is understandable given the seriousness of the offenses alleged against the Defendant. The delay caused by Johnson's actions harm the Defendant, the public, the United States, and indeed the Court as it results in a further

delay in resolving these cases. Additionally, in the case at hand it results in the significant increase in costs because a new attorney (untainted by these matters) essentially must start from scratch in reviewing the extensive discovery and the scheduling of 3-4 weeks for trial in each of these cases. The harm is not inconsequential as public funds for appointed counsel are not a bottomless well and are limited resource.

The Court further has no difficulty finding that Mr. Johnson's misconduct was more than mere recklessness. The Court notes that errors can happen in filings despite attorneys' (and even judges') best efforts. Yet the insertion of bogus citations is not a mere typographical error, nor the subject of reasonable debate. It is just wrong. There has been a plethora of general warnings from courts, bar associations, and the legal community at large about the risks of bogus citations generated by AI. Mr. Johnson even acknowledged that he was aware of such issues with other AI programs like ChatGPT. The fact he states he was unaware that a program such as Ghostwriter Legal could make such errors does not negate such a finding. Having been aware of the pitfalls of a failure to check citations supplied by another source, he still parroted citations generated by Ghostwriter Legal without verifying them. Ultimately such conduct reflects a complete and utter disregard for his professional duty of candor and is tantamount to bad faith. Thus, the Court will impose an appropriate sanction under its inherent authority.

**C.      Sanctions**

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44. "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id*. at 44-45; *see also J.C. Penney Corp., Inc. v. Oxford Mall, LLC*, 100 F.4th 1340, 1346 (11th Cir. 2024) (citing *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) ("The inherent powers of the federal

courts include the authority to fashion sanctions for conduct that abuses the judicial process."). A court may exercise this power "to sanction the willful disobedience of a court order, and to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 382 (2013) (citing *Chambers*, 501 U.S. at 45-46 and *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 257-59 (1975); *see also Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017) (quoting *Marx* and holding same).

> The "key to unlocking" that power is a finding of bad faith. [*Purchasing Power*, 851 F.3d at 1223]. But a blank conclusion that a party acted in bad faith is not enough; the court instead needs to make specific findings about which conduct justifies sanctions. *DeLauro [v. Porto]*, 645 F.3d [1294], 1304 [11th Cir. 2011]. And those findings must show "subjective bad faith," meaning intentional and not just reckless behavior. *Purchasing Power*, 851 F.3d at 1224-25. Still, that intent can be inferred "if an attorney's conduct is so egregious that it could only be committed in bad faith." *Id*.

*J.C. Penney*, 100 F.4th at 1346. Furthermore, this power is "for rectifying disobedience, regardless of whether such disobedience interfered with the conduct of the trial." *Purchasing Power*, 851 F.3d at 1225.

The Court already made its initial finding above, but notes specifically here that the conduct was intentional – i.e. Mr. Johnson intentionally utilized a program that supplied him legal argument, authorities, and citations, without making any effort to confirm that the information provided was accurate or indeed even existed. Mr. Johnson indicated he was aware that AI programs (such as ChatGPT) could make sure errors. Further, despite Mr. Johnson's protestations that he was not aware that Ghostwriter Legal could make such mistakes, the Court finds it is a distinction without a difference. Counsel was aware that he had an obligation to check his authorities and citations and instead merely parroted what the program spit out. Even if he was not aware that this particular program could make such errors, Mr. Johnson had an obligation to

check the citations before signing and filing the motion with the Court. Any reasonable investigation (even the most cursory of reviews) would have quickly shown the problem. Mr. Johnson failed to discharge the most basic of responsibilities of a lawyer to verify the statements in his motion were true. This is more than mere negligence or simple recklessness. It is unacceptable and caused significant real-world implications in the delay of two significant criminal cases, the further use of limited CJA funds for a newly appointed counsel to begin anew, a significant waste of time for the United States and the Court, and a delay in the public and Defendant's right to the prompt adjudication in both cases. To make it clear, the Court is not making its finding of bad faith simply based upon the fallout from the use of AI, but the Court cannot simply ignore them either. The most basic principle is that an attorney who signs a motion filed with the Court takes responsibility for that submission and risks serious sanctions when they make no effort to ensure the motion is grounded in the truth (in fact or in law).[6] Given the broad attention given to the problem with AI generated cases and authorities, no attorney can claim ignorance or simply bury their head in the sand when it comes to their own use of AI (regardless of what program they use). Accordingly, this misconduct is tantamount to bad faith and sanctionable under the Court's inherent authority.

To rectify the bad-faith misconduct in this case and vindicate the lawful authority of federal courts to keep proceedings free from falsehoods such as the ones at issue here, the Court will impose the least severe sanction that it finds likely to deter future similar misconduct. In exercising its inherent authority, the Court assigns a significant value to the deterrent function of a sanction.

---

[6] At its core, an attorney who signs a legal document certifies that they have "read the document, [have] conducted a reasonable inquiry into the facts and the law and [are] satisfied that the document is well grounded in both, and is acting without any improper motive." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 542 (1991). While this statement is made in the context of Rule 11, it holds no less true for any submission an attorney makes to the Court.

It has become clear that basic reprimands and small fines are not sufficient to deter this type of misconduct because if it were, we would not be here.  "If fines and public embarrassment were effective deterrents, there would not be so many cases to cite. And in any event, fines do not account for the extreme dereliction of professional responsibility that fabricating citations reflects, nor for the many harms it causes." *Johnson*, 2025 U.S. Dist. LEXIS 141805 at *59, 2025 WL 2086116 at *20.  In any event, a fine would not rectify the egregious misconduct in this case.

Rather, the Court finds that (1) a public reprimand with a limited publication requirement, (2) a referral to the Southern District of Alabama's advisory panel for review on removal from CJA panel, and (3) a fine in the amount of $5,000.00 payable to the CJA fund from which counsel was originally paid.[7]  The Court would have also considered potential disqualification, but that was rendered moot by the fact that the Defendant requested new counsel.

### III.   CONCLUSION

As a result of the Court's determination, it **ORDERS** the following:

1. Attorney James A. Johnson is hereby **REPRIMANDED** and this reprimand shall be published as follows:

    a. Attorney James A. Johnson shall file, not under seal, a copy of this Memorandum Opinion and Order in any case in any court wherein he has appeared as counsel and final judgment has not been entered;

    b.  Attorney James A. Johnson shall file, not under seal, a copy of this Memorandum Opinion and Order in any case in any court wherein he appears as counsel for

---

[7] As Mr. Johnson has already submitted and been paid for his work in this case out of CJA funds, the Court cannot merely reduce his fee petition.  Instead, the Court must assess a fine which will replenish and offset some (but not all) of the funds that will be expended by the new counsel appointed to represent Defendant McGee in these cases.

    twelve (12) months after the date of this order;

  c. Attorney James A. Johnson shall provide a copy of this Memorandum Opinion and Order to any jurisdiction under which he is licensed to practice law within two (2) business days of the issuance of this order. He shall further file a notice of compliance with the Court no later than the third business day.

  d. The Clerk of Court shall send a copy of this Memorandum Opinion and Order to the General Counsel of the Alabama State Bar for review. Though referred to the Alabama State Bar for any disposition it deems appropriate, the undersigned recommends that the public reprimand and sanctions contained within this order be the final action with regard to these particular allegations and facts.

  e. The Clerk of Court shall send a copy of this Memorandum Opinion and Order to the Chief Judges for the Northern District of Alabama and the Middle District of Alabama.

  f. To further effectuate the reprimands and deter similar misconduct by others, the Clerk of Court is **DIRECTED** to submit this order for publication in the Federal Supplement.

2. Attorney James A. Johnson is **REFERRED** to the Southern District of Alabama's advisory panel to consider whether he should be removed from the CJA panel.

3. The Court **IMPOSES** a fine in the amount of $5,000.00 payable to the CJA fund to offset some of the losses because of this matter.

**DONE** and **ORDERED** this 10th day of October, 2025.

                /s/Terry F. Moorer
                TERRY F. MOORER
                UNITED STATES DISTRICT JUDGE